**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 16-1417
———

JOAN KEDRA, in her own right and as personal
representative of the estate of David Kedra,
Appellant

v.

RICHARD SCHROETER
———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-15-cv-05223)
District Judge: Honorable Eduardo C. Robreno
———

Argued December 5, 2016

Before: FISHER,[*] KRAUSE, and MELLOY,[**] *Circuit Judges*.

———

[*] Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, assumed senior status on February 1, 2017.

(Filed:  November 28, 2017  )

Michael J. Quirk, Esq. (Argued)
Gerald J. Williams, Esq.
Williams Cuker & Berezofsky
1515 Market Street, Suite 1300
Philadelphia, PA 19102
        *Counsel for Appellant*

Kevin R. Bradford, Esq.
Stephen R. Kovatis, Esq.
Claudia M. Tesoro, Esq. (Argued)
Office of Attorney General of Pennsylvania
21 South 12th Street
Philadelphia, PA 19107
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge.*

This case arises from the grievous death of State Trooper David Kedra, who was shot and killed by his instructor, then-Corporal Richard Schroeter, during a routine firearms training.  Although a long-term veteran of the police force and specifically certified in the safe use of firearms,

_____

** Honorable Michael J. Melloy, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

2

Schroeter allegedly disregarded each of the steps that he previously acknowledged in writing were required to safely perform a live demonstration of a firearm—skipping over both his own safety check and an independent check by a second person, treating the gun as if it were unloaded instead of loaded, pointing it at a person instead of a safe target, bypassing the required visual and physical inspection before a "trigger pull," and then pulling the trigger with the gun aimed at Kedra's chest. JA 31.

Appellant brought a civil rights complaint under 42 U.S.C. § 1983 alleging that Schroeter's conduct had subjected her deceased son to a state-created danger in violation of his Fourteenth Amendment substantive due process rights. But because the complaint did not allege that Schroeter had actual knowledge that there was a bullet in the gun when he fired it at Kedra, the District Court held that Schroeter was entitled to qualified immunity and dismissed the complaint with prejudice. Its reasoning was that the complaint pleaded only an objective theory of deliberate indifference, i.e., what a reasonable official should have known because the risk was so obvious, which was not then-clearly established, and was insufficient to plead the clearly established subjective theory of deliberate indifference, i.e., that Schroeter was actually aware that his conduct carried a substantial risk of serious harm. We agree with the District Court that the objective theory of deliberate indifference was not clearly established at the time of the shooting. However, because obviousness of risk is relevant to proving actual knowledge and the allegations of the complaint here are more than sufficient to support a reasonable inference that Schroeter had such knowledge, we conclude the complaint adequately pleads a state-created danger claim under a then-clearly established

3

theory of liability. We therefore will reverse the District Court's grant of qualified immunity and remand for further proceedings.

## I. <u>Background</u>

As this is an appeal from a grant of a motion to dismiss, the factual allegations are taken from the complaint and are accepted as true.[1] *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 642 n.1 (2008). David Kedra was a twenty-six-year-old Pennsylvania State Trooper stationed in Montgomery County, Pennsylvania. In September 2014, Kedra was ordered to attend a routine firearm safety training, which included a demonstration of the features and operation of the new model of a State Police-issued handgun. The training was led by then-Corporal Schroeter, a trained firearms instructor who had been a police officer for about twenty years.

Before the training, Schroeter acknowledged in writing a list of firearms safety rules for instructors, including that he must always perform a safety check of a gun before using it for training; that he must implement a second check on whether it is loaded by, e.g., having a second person check the gun; that he must treat all guns as if they are loaded; that he must never point the muzzle of a gun at another person; that he must keep his finger off the trigger, unless he opens the gun to verify it is unloaded before pointing it at a safe target and pulling the

---

[1] Appellant filed a First Amended Complaint that differed from her original complaint only in listing her title as "personal representative of the Estate." JA 29. As the substance of the complaints is the same, we will simply refer to the relevant document as the "complaint."

trigger; and that he must open the gun to visually and physically determine that it is unloaded before ever pulling the trigger. At the training itself, however, Schroeter violated each of these rules when, in the course of explaining the "trigger reset" function on an operational handgun, he bypassed all of the safety checks, failed to physically or visually inspect the gun to ensure it was unloaded, raised the gun to chest level, pointed it directly at Kedra, and pulled the trigger. JA 32. The gun, in fact, was loaded, and it fired a bullet into Kedra's abdomen at close range, causing Kedra's death several hours later.

Criminal charges were filed by state authorities, eventually resulting in Schroeter's guilty plea in Pennsylvania state court to five counts of reckless endangerment of another person and his retirement from the State Police. In addition, Kedra's mother, as the representative of her son's estate, filed a one-count civil complaint against Schroeter in the U.S. District Court for the Eastern District of Pennsylvania, claiming a violation of Kedra's substantive due process rights to life and liberty under the Fourteenth Amendment, and making the above-referenced factual allegations, including as to Schroeter's training and experience, his written acknowledgement of the risks and attendant safety protocols, and his guilty plea.

Schroeter moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), claiming he was entitled to qualified immunity because "[t]he gravamen of [p]laintiff's [c]omplaint is that . . . Schroeter should have known that his firearm posed a substantial risk to those attending his class, not that . . . Schroeter actually did know that there was such a risk." Memorandum of Law in Support of Defendant's Motion to

Dismiss Complaint at 9–10, *Kedra v. Schroeter*, No. 15-5223 (E.D. Pa. Jan. 6, 2016), ECF No. 5-1. That theory of liability, Schroeter argued, was not then-clearly established and, hence, he was entitled to qualified immunity. Schroeter relied in particular on *Sanford v. Stiles*, 456 F.3d 298, 310 n.13 (3d Cir. 2006) (per curiam), in which we identified as an open question whether "deliberate indifference"—the mental state required for a state-created danger claim like this one—could be demonstrated using an objective test (i.e., merely by pointing to a substantial risk of serious harm that is so obvious that it should have been known), or whether, instead, a plaintiff must show the defendant had actual, subjective knowledge of the risk.

The District Court accepted both Schroeter's premise and conclusion, ruling, first, that Appellant's complaint did not plead deliberate indifference based on actual knowledge because Appellant conceded she "could not and would not plead that [Schroeter] knew there was a bullet in the gun," *Kedra v. Schroeter*, 161 F. Supp. 3d 359, 363 (E.D. Pa. 2016), and, second, that in view of *Sanford*, it was not clearly established that deliberate indifference could exist based only on the risk being "so obvious that it should be known," *id.* at 364–65 (quoting *Sanford*, 456 F.3d at 309). The District Court acknowledged Appellant's argument that, by alleging Schroeter had pleaded guilty to reckless endangerment, Appellant had necessarily pleaded actual knowledge because the mens rea for this offense under Pennsylvania law is "conscious disregard of a known risk of death or great bodily injury to another person." *Kedra*, 161 F. Supp. 3d at 364 n.5 (quoting *Commonwealth v. Klein*, 795 A.2d 424, 428 (Pa. Super. Ct. 2002)). However, the District Court deemed Schroeter's guilty plea irrelevant on the ground that it would

6

not satisfy the criteria for non-mutual offensive collateral estoppel.[2] *Id.* Accordingly, the District Court viewed this case as "present[ing] the scenario anticipated but left unresolved by *Sanford*: a state actor proceeding despite a patently obvious risk that the actor should have recognized, but without actual knowledge that the risk existed," and, thus, a theory of deliberate indifference that was not clearly established as required to defeat qualified immunity. *Id.* at 364–66. On that basis, the District Court dismissed the complaint with

---

[2] Collateral estoppel is a judicial doctrine that precludes relitigation of an issue already decided in a previous proceeding if "(1) the issue decided in the prior adjudication was identical with the one presented in the later action, (2) there was a final judgment on the merits, (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action." *Dici v. Pennsylvania*, 91 F.3d 542, 547–48 (3d Cir. 1996). The District Court believed this last criterion was not satisfied because Schroeter did not "ha[ve] a 'full and fair opportunity to litigate' the question of his constitutional culpability on the basis of a guilty plea in a state criminal court." *Kedra*, 161 F. Supp. 3d at 364 n.5. Although Appellant did not rely on the guilty plea for its preclusive effect, but only as a basis from which to infer Schroeter's actual knowledge of the risk of harm, the District Court assumed that the requirements for collateral estoppel had to be satisfied for the plea to be considered in any way relevant. *Id.*

prejudice,[3] *Kedra*, 161 F. Supp. 3d at 365–66, and this timely appeal followed.

## II.    Jurisdiction and Standard of Review

The District Court had federal question jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291.  We exercise plenary review over both a District Court's dismissal under Federal Rule of Civil Procedure 12(b)(6) and its grant of qualified immunity. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013); *McLaughlin v. Watson*, 271 F.3d 566, 570 (3d Cir. 2001).  In reviewing an order of dismissal under Federal Rule of Civil Procedure 12(b)(6), we, like the District Court, must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228, 230 (3d Cir. 2008).

## III.    Discussion

The doctrine of qualified immunity shields government officials from civil liability for constitutional violations only if "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v.*

---

[3] Appellant argues before us that the dismissal should have been without prejudice so that she could have an opportunity to supplement her pleading of deliberate indifference in an amended complaint.  Because we conclude Appellant already pleaded sufficient facts to sustain her claim, *see infra* Section III.B.1, we need not address whether the District Court erred in denying leave to amend.

*Creighton*, 483 U.S. 635, 638 (1987). In considering whether qualified immunity attaches, courts perform a two-pronged analysis to determine: (1) "whether the facts that [the] plaintiff has alleged . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Here, the District Court disposed of the complaint at the second prong by concluding that because Appellant had not alleged Schroeter's actual knowledge of a bullet in the chamber, her theory of deliberate indifference was based solely on the objective test we had identified in *Sanford* as unresolved, so that "the violative nature of Defendant's alleged conduct ha[d] not been clearly established." *Kedra*, 161 F. Supp. 3d at 364–66.

As a preliminary matter that will inform the scope of our review, we note that by taking this approach, the District Court addressed the "clearly established" inquiry only in part. For the question posed by the District Court—whether it was then-clearly established that obviousness of risk untethered from actual knowledge could prove deliberate indifference—goes to whether the plaintiff sufficiently pleaded the elements of a state-created danger claim, as then defined. *See Phillips*, 515 F.3d at 235, 240–42. In contrast, the clearly established inquiry at the second prong, as we have described it, goes not to whether a plaintiff sufficiently pleaded a constitutional violation (the question answered at the first prong), but to whether the right allegedly violated—defined in terms of the "particularized" factual context of that case, *Anderson*, 483 U.S. at 639–40—was a "clearly established statutory or constitutional right[] of which a reasonable [officer] would have known," *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142

9

n.15 (3d Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).[4]

Granted, the contours of a given right are necessarily co-extensive with the scope of conduct that violates that right, so that where it would not be clear to "a reasonable official . . . that what he is doing violates [a] right," *Anderson*, 483 U.S.

---

[4] In ruling that an objective test was not a clearly established means to plead deliberate indifference, the District Court's approach arguably combined elements of both the first and second prongs of the qualified immunity analysis. Yet, those inquiries diverge in a significant respect with regard to mens rea, for even where an element of a claimed violation includes a subjective test, "the test for qualified immunity is objective . . . . That is, [an official] is entitled to qualified immunity only if she can show that a reasonable person in her position at the relevant time could have believed, in light of clearly established law, that her conduct comported with established legal standards." *Beers-Capitol*, 256 F.3d at 142 n.15. And for that reason, we have instructed courts to treat the two prongs of qualified immunity as analytically distinct so as to avoid confusing their different mens rea requirements. *Phillips*, 515 F.3d at 242. At the same time, as the Supreme Court has recognized, "whether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded," and "[i]n that sense the sufficiency of [Appellant's] pleadings is both inextricably intertwined with, and directly implicated by, the qualified immunity defense." *Ashcroft v. Iqbal*, 556 U.S. 662, 673 (2009) (citations and internal quotation marks citations omitted); *accord L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016).

at 640, the second prong of qualified immunity would not be satisfied regardless of whether the lack of clarity arose from an uncertain theory of liability or from the application of a clearly established theory of liability to a set of facts so novel as to deprive an actor of fair notice of the violative nature of his actions. But where a defendant contends that neither the theory of liability nor the right at issue is clearly established, the reviewing court may need to analyze both to determine conclusively whether the defendant is entitled to qualified immunity. *See, e.g.*, *Beers-Capitol*, 256 F.3d at 142 n.15 (observing, on the one hand, that the constitutional right as defined by the factual context of that case was clearly established and, on the other hand, that the "doctrine of deliberate indifference was also clearly established at the relevant time").

Here, the District Court addressed the "clearly established" inquiry only in the first sense, determining that the theory of liability was not clearly established. Because we conclude this was error, we also address the inquiry in the second sense, assessing whether, under the facts of this case, the specific right at issue was clearly established.[5] Thus, first we will undertake a review of relevant substantive due process principles. *See infra* Section III.A. Second, we will examine

---

[5] We undertake this inquiry in the first instance to decide whether we may affirm on this alternative ground, *see MRL Dev. I, LLC v. Whitecap Inv. Corp.*, 823 F.3d 195, 202 (3d Cir. 2016), and because it turns on a purely legal question, our resolution of which will best serve the interests of judicial efficiency on remand, *see Wallach v. Eaton Corp.*, 837 F.3d 356, 374–75 (3d Cir. 2016); *Loretangeli v. Critelli*, 853 F.2d 186, 189 n.5 (3d Cir. 1988).

whether the complaint sufficiently pleads a violation of Kedra's substantive due process rights under a theory of deliberate indifference that was clearly established. *See infra* Section III.B. And third, we will consider whether the particular right at issue was clearly established at the relevant time, *see infra* Section III.C, i.e., "whether the law, as it existed [at the time of the shooting], gave [Schroeter] 'fair warning' that [his] actions were unconstitutional" in the particular factual scenario he confronted. *Estate of Smith v. Marasco*, 430 F.3d 140, 154 (3d Cir. 2005).

## A. Applicable Legal Principles

In asserting her claim under 42 U.S.C. § 1983 for a deprivation of Kedra's rights to life and liberty, Appellant invokes the Due Process Clause, which at its core protects individuals against arbitrary government action. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). While "the Due Process Clause does not impose an affirmative obligation on the state to protect its citizens," there is an exception to this general rule that nevertheless holds an officer liable if his conduct exposes an individual to a "state-created danger."[6] *Phillips*, 515 F.3d at 235. Such a claim requires

---

[6] We are unconvinced by Schroeter's argument that no state-created danger claim is cognizable where, as here, the alleged violation is based on a state actor's endangerment of a fellow government employee. While the Due Process Clause does not guarantee state employees "certain minimal levels of safety and security" in the workplace, *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992), we have long held that a government employee may bring a substantive due process claim against his employer if the state compelled the employee

12

proof of four elements: (1) the harm caused was foreseeable and fairly direct; (2) the state official "acted with a degree of culpability that shocks the conscience"; (3) the state and the plaintiff had a relationship such that "the plaintiff was a foreseeable victim of the defendant's acts"; and (4) the official affirmatively used his authority "in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger" than had he never acted. *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006).

Here, the District Court focused, as do the parties on appeal, on the second element of a state-created danger claim.[7]

_____

to be exposed to a risk of harm not inherent in the workplace, *see Kaucher v. Cty. of Bucks*, 455 F.3d 418, 430–31 (3d Cir. 2006); *Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204, 212–13 (3d Cir. 2001). We have no trouble concluding this standard is met in the context of a mandatory firearms training in which the trainees were required to be physically present without protection and the firearms instructor, instead of following safety protocols and demonstrating the proper use of a firearm, disregarded all protocols and fired directly at a trainee at close range.

[7] Schroeter also appears to contest the fourth element by casting his conduct as an omission to check the gun for a bullet and contending that he may be held liable only for an affirmative act. Yet the complaint alleges Schroeter skipped over required safety checks, picked up a firearm, raised it, pointed it at Kedra, and pulled the trigger. These indisputably affirmative acts "created an opportunity for harm that would not have otherwise existed." *Rivas v. City of Passaic*, 365 F.3d 181, 197 (3d Cir. 2004). Those acts, which directly caused Kedra's death, also set this case apart from those that we have

13

*See Kedra*, 161 F. Supp. 3d at 363.  That is, because "[l]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," *Lewis*, 523 U.S. at 849, government action rises to the level of an actionable constitutional violation only when it is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *id*. at 847 n.8.  The exact level of culpability required to shock the conscience, however, depends on the circumstances of each case, and the threshold for liability varies with the state actor's opportunity to deliberate before taking action.  *Phillips*, 515 F.3d at 240–41; *see also Lewis*, 523 U.S. at 848–54.

We have identified three potential levels of culpability.  In "hyperpressurized environment[s] requiring a snap judgment," an official must actually intend to cause harm in order to be liable.  *Vargas v. City of Philadelphia*, 783 F.3d 962, 973 (3d Cir. 2015) (internal quotation marks omitted).  In situations in which the state actor is required to act "in a matter of hours or minutes," we require that the state actor "disregard a great risk of serious harm."  *Sanford*, 456 F.3d at 310.  And where the actor has time to make an "unhurried judgment[]," a plaintiff need only allege facts supporting an inference that the official acted with a mental state of "deliberate indifference." *Id.* at 309.

---

deemed to involve mere omissions.  *See, e.g.*, *Bright*, 443 F.3d at 284–85 (state actor not liable for failing to prevent harm inflicted by a third party); *D.R. ex rel. L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1374–76 (3d Cir. 1992) (en banc) (same).

14

As the District Court correctly recognized, *see Kedra*, 161 F. Supp. 3d at 363, because Appellant here alleged that Schroeter had the opportunity to exercise "unhurried judgment[]," she was required to plead facts in her complaint supporting the inference that Schroeter acted with "deliberate indifference," which we have described variously as a "conscious disregard of a substantial risk of serious harm," *Vargas*, 783 F.3d at 973–74 (brackets and internal quotation marks omitted), or "willful disregard" demonstrated by actions that "evince a willingness to ignore a foreseeable danger or risk," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997). While categorically different from "intent to cause harm," which is the threshold mental state reserved for officials in "hyperpressurized" situations where "snap judgment[s]" may be required, *Vargas*, 783 F.3d at 973, deliberate indifference "has an elusive quality to it," *Sanford*, 456 F.3d at 301, "fall[ing] somewhere between intent, which 'includes proceeding with knowledge that the harm is substantially certain to occur' and negligence, which involves 'the mere unreasonable risk of harm to another,'" *Morse*, 132 F.3d at 910 n.10.

Here the District Court examined one of the elusive aspects of deliberate indifference with which we and other Courts of Appeals have wrestled over time: whether deliberate indifference in the substantive due process context—as opposed to the Eighth Amendment context—may be satisfied using an objective test or only a subjective "actual knowledge" test. *See Kedra*, 161 F. Supp. 3d at 364–65 (citing *Sanford*, 456 F.3d at 309 & n.13). In the Eighth Amendment context, the Supreme Court has rejected an objective standard for "deliberate indifference," i.e., a standard where liability may be premised on an official's objective "failure to alleviate a

15

significant risk that he should have perceived but did not," *Farmer v. Brennan*, 511 U.S. 825, 838 (1994), and the Court has instead explicitly required a showing of "subjective culpability," *id.* at 843 n.8, i.e., a showing that "the official kn[ew] of and disregard[ed] an excessive risk," *id.* at 837. But uncertainty about whether this "subjective culpability" requirement carried over to pretrial detainees and other plaintiffs asserting substantive due process claims produced a split among the Courts of Appeals.[8] That split led us in *Sanford* to note, in the substantive due process context, "the possibility that deliberate indifference might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known," 456 F.3d at 309, and to acknowledge shortly thereafter that we "ha[d] not yet definitively answered the question of whether the appropriate standard in a non-Eighth Amendment substantive due process case is subjective

---

[8] *Compare, e.g.*, *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (noting that the test for deliberate indifference under the Fourteenth Amendment is "closer to tort recklessness" than to the Eighth Amendment's "criminally reckless" standard), *Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 905–06 (8th Cir. 1999) (suggesting that the purely subjective standard from *Farmer* may be inappropriate for due process claims brought by pretrial detainees), *and Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003) (framing the standard in the state-created danger context as whether the risk was "obvious or known"), *with, e.g.*, *Ewolski v. City of Brunswick*, 287 F.3d 492, 513 (6th Cir. 2002) (adopting *Farmer*'s subjective standard for due process claims), *and Hare v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996) (en banc) (same).

16

or objective," *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 430–31 (3d Cir. 2006).

More recently, both the Supreme Court and this Court have spoken to the issue. In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), distinguishing between the different language of the Eighth Amendment and the Due Process Clause and the different nature of those claims, the Supreme Court held that a pretrial detainee claiming a substantive due process violation based on excessive force "must show . . . only that the officers' use of that force was *objectively* unreasonable" and not "that the officers were *subjectively* aware that their use of force was unreasonable." *Id.* at 2470, 2475. While the Court acknowledged that "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind" because "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," it clarified that this subjective requirement pertained only to "the defendant's state of mind with respect to his physical acts"—in other words, his actions themselves needed to be deliberate and not "accidental[]" or "negligent[]"—but did not pertain to whether the actions the defendant deliberately took were "unreasonable" or "excessive in relation to [a legitimate] purpose." *Id.* at 2472–73 (emphasis omitted). Rejecting the arguments that an objective test would devolve into a negligence standard, *id.* at 2474, was not "workable," *id.*, or would lead to a "flood of claims," *id.* at 2476, the Court held that "the defendant's state of mind with respect to the proper *interpretation*" of his physical acts should be assessed by an

"objective standard," depending on "the perspective of a reasonable officer on the scene."[9] *Id.* at 2472–73.

Consistent with this approach, we too recently embraced an objective standard in the context of a substantive due process claim—in particular, for a claim of state-created danger. In *L.R. v. School District of Philadelphia*, we denied qualified immunity to a teacher who released a kindergartener

---

[9] Recognizing the significance of *Kingsley*, the Ninth Circuit, sitting en banc, has extended it to failure-to-protect claims, framing the test as whether a "reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious," *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc), and the Second Circuit has extended it to conditions-of-confinement claims, holding that "deliberate indifference should be defined objectively for a claim of a due process violation" and that the relevant inquiry post-*Kingsley* is what the "defendant-official knew, or should have known," *Darnell v. Pineiro*, 849 F.3d 17, 35–36 (2d Cir. 2017). *Cf. Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (declining to extend *Kingsley* to failure-to-protect claims absent en banc reconsideration of controlling Circuit precedent). Like the Supreme Court, both Circuits explicitly rejected arguments that an objective test would devolve into a negligence standard. *See Darnell*, 849 F.3d at 36 ("[A]ny § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence."); *Castro*, 833 F.3d at 1071 n.4 (observing that an objective test "prevent[s] 'overinclusiveness' by ensuring that liability will attach only in cases where the defendant's conduct is more egregious than mere negligence").

18

to a stranger who then abused the child. 836 F.3d 235 (3d Cir. 2016). After reiterating our observation in *Sanford* that "deliberate indifference might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known," *id.* at 246, we held this standard was met by the allegations in that complaint. Specifically, we held the risk of harm from the teacher's conduct was "'so obvious' as to rise to the level of deliberate indifference," *id.*, and that L.R. had sufficiently pleaded as "a matter of common sense" that the teacher "knew, *or should have known*, about the risk of his actions," *id.* at 245 (emphasis added). Although we indicated that the plaintiff's allegations also satisfied the subjective standard, *id.* at 246 ("What is more, . . . the fact that [the teacher] asked [the stranger] for her identification illustrates that [the teacher] himself was indeed aware of the risk of harm[.]"), we concluded that "[e]xposing a young child to an obvious danger is the quintessential example of when qualified immunity should not shield a public official from suit," *id.* at 250.[10]

---

[10] In his concurrence, Judge Fisher seeks to revisit *L.R.*, positing, despite its terms, that it left *Sanford*'s question unanswered; that its reliance on the objective test was dictum because it also observed the teacher's conduct would meet the subjective test, *but see Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) (discussing the significance of alternative holdings); *Meister v. Comm'r*, 504 F.2d 505, 509 (3d Cir. 1974) (noting that where we give "an alternative basis for our holding" prefaced with language such as "*additionally*," this does not mean the earlier holding is to be "disregarded" or is any less "critical"); and that an objective test cannot distinguish between conscience-shocking behavior and mere negligence and thus risks rendering the Fourteenth Amendment a "font of

19

Seeking to benefit from the trajectory of this case law,[11] Appellant would have us rely on *L.R.* to conclude an objective

tort law," Concurrence at 6; *but see Kingsley*, 135 S. Ct. at 2474; *Palakovic*, 854 F.3d at 231; *Darnell*, 849 F.3d at 35–36; *Castro*, 833 F.3d at 1071. While our concurring colleague may disagree with the evolution of our substantive due process jurisprudence, we generally may not, short of en banc reconsideration, alter our Circuit precedent, *see Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 116 (3d Cir. 2010), and we have no occasion to do so today. Instead, our concern is whether Appellant sufficiently pleaded deliberate indifference under a culpability standard that was then-clearly established. For the reasons we explain below, *see infra* Section III.B.1, Appellant's allegations as to Schroeter's training and experience, to say nothing of his written acknowledgements and admissions in the context of his guilty plea, are more than sufficient to show deliberate indifference under the then-clearly established subjective standard and conduct that was not merely negligent but "shocks the conscience," *Bright*, 443 F.3d at 281.

[11] We also recently resolved what we had identified as an open question after *Farmer*, *see Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 321 (3d Cir. 2005), as to whether the "deliberate indifference" standard in the prison suicide context is a subjective or objective one. *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017). There too we held the standard was objective and identified the relevant inquiry for both substantive due process claims and Eighth Amendment claims as whether "the prison official knew or *should have known* of the individual's particular vulnerability," *id.* at 224 (emphasis added), explaining that "[i]t is not necessary for the custodian to have a subjective appreciation of the detainee's particular

standard of deliberate indifference was clearly established at the time Schroeter shot Kedra and to reverse the District Court on that basis. We reject that invitation, however, because we assess qualified immunity based on the law that was "clearly established at the time an action occurred," *Harlow*, 457 U.S. at 818, while *L.R.* was not decided until nearly two years after the action at issue in this case. That is, regardless of what may be deemed "clearly established" in the wake of *Kingsley* and *L.R.*, we must look to the state of the law at the time of shooting. And at that point, as the District Court correctly recognized, it was not yet clearly established whether deliberate indifference in the substantive due process context was governed by an objective or subjective standard. *See Kedra*, 161 F. Supp. 3d at 364–65 (citing *Sanford*, 456 F.3d at 309 & n.13). The question to which we therefore turn is whether Appellant pleaded deliberate indifference under the subjective test, which was then-clearly established, or under an objective test, which then was not.

B. Whether Appellant Pleaded Her Claim Under A Clearly Established Theory of Deliberate Indifference

Given the historical ambiguity in our case law, we agree with the District Court that Schroeter's arguments might have traction if Appellant had pleaded deliberate indifference based merely on what Schroeter *should have known* in view of the obviousness of a particular risk. But there's the rub: That is

vulnerability. Rather, . . . 'reckless or deliberate indifference to that risk' only demands 'something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide,'" *id.* at 231 (citation omitted).

not what Appellant pleaded. Contrary to the way that Schroeter and the District Court characterize it, the complaint here clearly and unmistakably alleges facts that support an inference of actual, subjective knowledge of a substantial risk of lethal harm, and neither the Supreme Court nor we have wavered from the well-established principle that a plaintiff may plead and prove deliberate indifference in the substantive due process context using this subjective test.

In the discussion to follow, we first address whether the complaint pleads deliberate indifference under the clearly established subjective test and then turn to the District Court's misunderstanding of that test in requiring Appellant to plead knowledge of the certainty of harm instead of knowledge of the substantial risk of harm.

### 1. *Application of the Deliberate Indifference Standard*

At the pleading stage, courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 233. Although "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), we demand "only enough facts to state a claim to relief that is plausible on its face" and "do not require heightened fact pleading of specifics," *id.* at 570. Determining whether the facts pleaded have "nudged" the claim "across the line from conceivable to plausible" is "a context-specific task that requires the reviewing court to draw on its judicial

22

experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009).

To make this assessment on a Rule 12(b)(6) motion, "courts must consider the complaint in its entirety," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "determine whether the complaint as a whole contains sufficient factual matter to state a facially plausible claim," *Argueta v. U.S. Immig. & Customs Enf't*, 643 F.3d 60, 74 (3d Cir. 2011). "The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23.

Here, then, the relevant question is whether the complaint, considering all the allegations, pleads sufficient facts to support the inference that when Schroeter pointed his gun at Kedra at close range and deliberately pulled the trigger without even once checking whether the gun was loaded, he acted with subjective deliberate indifference, i.e., actual awareness of a substantial risk of serious harm, lying "somewhere between intent . . . and negligence." *Morse*, 132 F.3d at 910 n.10. A plaintiff can plead deliberate indifference by reference to circumstantial and direct evidence. *See Farmer*, 511 U.S. at 842. Three broad categories of circumstantial evidence are alleged in the complaint, and we have deemed each probative of deliberate indifference in the past: (1) evidence that the risk was obvious or a matter of common sense, (2) evidence that the actor had particular professional training or expertise, and (3) evidence that the actor was expressly advised of the risk of harm and the

23

procedures designed to prevent that harm and proceeded to violate those procedures.

*First*, the complaint points to the obvious risk of harm in pointing the muzzle of a gun at another person and pulling the trigger, while skipping any kind of safety check. Perhaps because it concluded that Appellant pleaded deliberate indifference by relying on only the objective obviousness of risk, the District Court did not acknowledge or discuss the relevance of obviousness of risk to proving actual knowledge of risk. *See Kedra*, 161 F. Supp. 3d at 362–66. But the Supreme Court has long recognized that, even under a subjective test, "the fact that the risk of harm is obvious" is relevant, among other pieces of evidence, to "infer the existence of this subjective state of mind." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). We, too, have observed that "subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk."[12] *Beers-Capitol*, 256 F.3d at 133.

---

[12] Our Sister Circuits, with near unanimity, also have recognized the relevance of obviousness of risk to proving actual knowledge. *See, e.g.*, *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 75 (1st Cir. 2016); *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 n.6 (2d Cir. 1999); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 469 (6th Cir. 2006); *Farnham*, 394 F.3d at 478; *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 (9th Cir. 2006); *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015).

For that reason, we have regularly relied on the obviousness of risk as a permissible and highly relevant basis from which to infer actual knowledge—even directing in our Model Civil Jury Instructions that, in assessing deliberate indifference for state-created danger claims, a jury is "entitled to infer from the obviousness of the risk that [the state actor] knew of the risk." Third Circuit Model Civil Jury Instructions § 4.14 (Mar. 2017). In *Kneipp v. Tedder*, for example, police officers sent a woman home "unescorted in a visibly intoxicated state in cold weather," and we reversed a grant of summary judgment in their favor, citing the foreseeable and obvious risk that the woman would later fall down an embankment and suffer hypothermia. 95 F.3d 1199, 1201–03, 1208–09, 1211 (3d Cir. 1996). In *Phillips v. County of Allegheny*, 911 dispatchers gave confidential information to a distressed and suspended co-worker concerning the whereabouts of his ex-girlfriend, and we likewise reversed the dismissal of a complaint against the dispatchers because they were "aware that [the co-worker] was distraught over his break up" and they could reasonably foresee that some type of serious harm could result from giving him the information; hence, the inferences to be drawn from "ordinary common sense" supported the dispatchers' knowledge of risk. 515 F.3d at 228–29, 241, 246. So too here: The risk of lethal harm when a firearms instructor skips over each of several safety checks designed to ascertain if the gun is unloaded, points the gun at a trainee's chest, and pulls the trigger is glaringly obvious, and this obviousness supports the inference that the instructor had actual knowledge of the risk of serious harm.

*Second*, the complaint alleges that Schroeter was a specially trained firearms instructor with twenty years of experience. And that training and experience is no less

25

relevant to Schroeter's actual knowledge of the substantial risk of harm here than the "medical training" of which we took note for the emergency medical technicians in *Rivas v. City of Passaic*, 365 F.3d 181, 185, 194–95 (3d Cir. 2004), or the "experience as a teacher in charge of a kindergarten classroom" that we deemed relevant to the teacher's knowledge of risk in releasing the child to a stranger in *L.R.*, 836 F.3d at 245;[13] *see also MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 217 (3d Cir. 2005) (observing that, even where a risk is "so obvious," an individual's prior "experience and knowledge" makes it more likely that he will "realize[]" that risk). Thus, even if, hypothetically, the obviousness of the risk here would not be sufficient to impute actual knowledge to a layperson, the combination of obviousness with Schroeter's specialized training and expertise in firearms safety is easily sufficient to give rise to an inference of actual knowledge of risk.

*Third*, the complaint alleges that Schroeter was expressly advised of the lethal risk in handling any operational firearm through the safety rules that he acknowledged in writing and that, as a training instructor, he himself was responsible for teaching to others. Those safety protocols were

---

[13] Schroeter argues that we should disregard *L.R.* entirely because it post-dated the shooting. As the Supreme Court has observed, however, a later-decided case may still be considered when assessing whether a principle was clearly established to the extent the case is merely "illustrative of the proper application" of a previously established constitutional principle. *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (discussing this meaning of "clearly established" in the habeas context). It is for that limited purpose that we refer to *L.R.* in this part of our discussion.

clear and detailed, requiring that an instructor, prior to demonstrating the use of a firearm, (a) conduct a safety check to ensure the gun was not loaded, (b) implement a second safety check by, e.g., having a second person independently verify the gun is not loaded, (c) always treat the firearm as if it were loaded, (c) point the muzzle only at a safe target, (d) never point the firearm at another person, (e) always keep his finger off the trigger unless firing at a safe target, and (f) before demonstrating a "trigger pull," open the gun to visually and physically confirm it is unloaded. JA 31. The complaint alleges that Schroeter not only ignored these directives but directly contravened each and every one of them. Those allegations—which could be characterized as not merely circumstantial, but even direct, evidence of mens rea—give rise to at least as strong an inference of knowledge of risk as the kindergarten teacher's knowledge and disregard of school policy concerning the release of children in *L.R.*, 836 F.3d at 240 & n.2, 245, and the 911 dispatchers' "unauthorized" disclosure of what they knew constituted "confidential information" in *Phillips*, 515 F.3d at 229, 241.

In addition to these three categories of evidence that support an inference of actual knowledge, the complaint also alleges direct evidence of Schroeter's mental state in the form of his criminal plea to reckless endangerment. That guilty plea required Schroeter, as a matter of Pennsylvania law, to admit that he "recklessly engage[d] in conduct which place[d] . . . another person in danger of death or serious bodily injury," 18 Pa. Cons. Stat. § 2705, with the mental state of "conscious[] disregard[] [of] a substantial and unjustifiable risk" of serious harm, 18 Pa. Cons. Stat. § 302(b)(3); *see also Klein*, 795 A.2d at 427–28. In other words, even assuming Appellant could not invoke "non-mutual offensive collateral estoppel" to seek a

27

judgment based in part on issue preclusion—which was the ground on which the District Court disregarded the plea,[14] *Kedra*, 161 F. Supp. 3d at 364 n.5—the allegation in the complaint that Schroeter pleaded guilty to these charges reflects a statement by a party-opponent, presumptively admissible at trial, *see* Fed. R. Evid. 801(d)(2), that Schroeter acted with the requisite knowledge of risk.

In sum, this is not a case where Appellant's theory of deliberate indifference devolves to mere negligence or is based only on what Schroeter objectively should have known given the obvious risk. Instead, the obviousness of the risk in pointing a gun at a defenseless person and pulling the trigger

[14] The question whether a state criminal conviction based on a guilty plea may be preclusive of any claims or issues is a question of the law of the state where the criminal proceeding took place, *see Allen v. McCurry*, 449 U.S. 90, 104–05 (1980); *Dici*, 91 F.3d at 547–48, and one we need not answer as Appellant relies on the plea at this stage not to invoke issue preclusion, but only to argue that her allegations were sufficient to survive Schroeter's motion to dismiss. We note, however, that under Pennsylvania law, a party's "criminal conviction may be used to establish the operative facts in a subsequent civil case based on those same facts, and . . . [a] guilty plea constitutes an admission to all the facts averred in the indictment." *Commonwealth, Dep't of Transp. v. Mitchell*, 535 A.2d 581, 585 (Pa. 1987) (citation omitted); *see also* Restatement (Second) of Judgments § 85 cmt. c (Am. Law Inst. 1982). Particularly where, as here, a party is not claiming issue preclusion but is relying on a plea only as a factual allegation to support an inference of actual knowledge, the plea is, at least to that extent, relevant.

without undertaking any safety check whatsoever only reinforces the many other allegations of the complaint reflecting Schroeter's "conscious disregard of a substantial risk of serious harm." *Vargas*, 783 F.3d at 973 (brackets and internal quotation marks omitted). "[D]raw[ing] all inferences from the facts alleged in the light most favorable to [Appellant]," *Phillips*, 515 F.3d at 228, the allegations in Appellant's complaint are more than sufficient to state a claim for a state-created danger based on actual knowledge of a substantial risk of serious harm—the subjective theory of deliberate indifference that was then-clearly established. *See Sanford*, 456 F.3d at 309–10 & n.13.

> 2. *The District Court's Misapprehension of the Culpability Required for Deliberate Indifference*

The District Court reached the opposite conclusion, relying on the premise that Schroeter's conduct could not reflect a "conscious disregard of a substantial risk of serious harm," *Vargas*, 783 F.3d at 973–74 (brackets and internal quotation marks omitted), unless Schroeter actually knew there was a bullet in the chamber, *see Kedra*, 161 F. Supp. 3d at 363–66. That approach, however, fundamentally misapprehends (1) the relevance of circumstantial evidence to inferring actual knowledge, (2) the pleading standard applicable at this stage of the case, (3) the culpability required for cases involving "unhurried judgment[]," *Vargas*, 783 F.3d at 973, and (4) the essential purposes of the state-created danger doctrine.

*First*, by requiring Appellant to plead Schroeter's knowledge of a bullet in the chamber, the District Court in effect required plaintiffs to plead actual knowledge using only

29

direct evidence. But the Supreme Court has instructed that "[w]hether a [state actor] ha[s] the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," *Farmer*, 511 U.S. at 842 (citation omitted); *see also Hope*, 536 U.S. at 738, and we have likewise stated that "[i]nferring mental state from circumstantial evidence is among the chief tasks of factfinders," *United States v. Wright*, 665 F.3d 560, 569 (3d Cir. 2012); *see also McFadden v. United States*, 135 S. Ct. 2298, 2304 n.1 (2015) ("The Courts of Appeals have held that, as with most *mens rea* requirements, the Government can prove the requisite mental state through either direct evidence or circumstantial evidence.").

*Second*, in concluding that the allegations of the complaint (other than Schroeter's criminal guilty plea) do not give rise to an inference of actual knowledge of risk, the District Court and our concurring colleague have done the inverse of what we are required to do at the pleading stage: Instead of considering the complaint as a whole, they consider "whether any individual allegation, scrutinized in isolation, meets that standard," *Tellabs*, 551 U.S. at 322–23, and instead of "draw[ing] all inferences from the facts alleged in the light most favorable to [the plaintiff]," *Phillips*, 515 F.3d at 228, they draw all inferences in the light most favorable to the defendant. For example, while acknowledging that obviousness of risk can support an inference of actual knowledge, the Concurrence posits that obviousness of risk "could also . . . support an inference that there was not deliberate indifference." Concurrence at 9. While not disputing that Schroeter's training and experience are relevant

30

to assessing Schroeter's state of mind, the Concurrence hypothesizes that they make it less plausible, not more plausible, that Schroeter was aware that his conduct carried a substantial risk of lethal harm.[15]   And while granting that

---

[15] At oral argument, Schroeter's counsel went even further, stating that "[b]ecause Corporal Schroeter was an experienced person with training experience, in particular, it can't be alleged that he knew he wasn't following [the safety protocols].  He has to have believed he was following . . . them or he would not have done what he did."  Oral Arg. at 37:43–38:06, *available at* http://www2.ca3.uscourts.gov/oral argument/audio/16-1417Kedrav.Schroeter.mp3.   Aside from being entirely circular, Schroeter's reasoning that the more obvious the risk, the weaker the inference of conscious disregard, flies in the face of Supreme Court precedent, which not only treats obviousness of risk as a basis from which to infer actual knowledge of risk, *see, e.g.*, *Hope*, 536 U.S. at 738; *see also Phillips*, 515 F.3d at 237–39; *Morse*, 132 F.3d at 910 n.10; *Kneipp*, 95 F.3d at 1208–09, but, as discussed above, also instructs us, in reviewing the sufficiency of a complaint, to draw this very reasonable inference in favor of the plaintiff—not, as Schroeter urges, the other way around, *see Iqbal*, 556 U.S. at 678; *see also Phillips*, 515 F.3d at 231, 233.  Counsel's argument points up another reason qualified immunity must be denied in this case: The complaint alleges that Schroeter acted with actual awareness of the risk; Schroeter disputes that allegation.   What we have here portends a quintessential disputed issue of material fact, turning on the credibility of witnesses to be assessed by a jury, *see Metzger v. Osbeck*, 841 F.2d 518, 521 (3d Cir. 1988), and certainly not appropriate for resolution on a motion to dismiss, *see Phillips*, 515 F.3d at 234–35.

Schroeter acknowledged in writing the safety protocols he failed to follow, the Concurrence rejects the unavoidable inference that Schroeter therefore knew the risk of harm those protocols were intended to prevent and instead speculates that Schroeter possibly "d[id] not . . . remember[]" his training and did not know that "he failed to follow" the rules. Concurrence at 10. Only by drawing each inference in favor of the defendant can the District Court and Concurrence conclude that Schroeter was not "aware . . . that pulling the trigger carried a deadly risk," *Kedra*, 161 F. Supp. 3d at 363–64, or that it is no more than "possibl[e]" or "conceivable" that he knew the gun "might be loaded" when he fired it. Concurrence at 9 (alteration in original).

Although, at trial, Schroeter might offer evidence that he affirmatively believed the gun was unloaded and had some reasonable basis for such a belief, we may not prevent the case from ever reaching trial by positing other possible inferences and "den[ying]" the plaintiff "the inferences to which her complaint is entitled," *Phillips*, 515 F.3d at 237. Instead, we need only ask whether it is "plausible"—given the obviousness of the risk—to believe a trained firearms instructor with twenty years' experience knows that any unchecked gun might be loaded and therefore cannot be fired at another person without substantial risk of serious harm.[16] To state the question is, as a

---

[16] The Concurrence contends that obviousness of risk could not, in and of itself, be sufficient to plead actual knowledge, excerpting from *Farmer* that "obviousness of a risk is not conclusive." Concurrence at 8 (quoting *Farmer*, 511 U.S. at 843 n.8). In context, however, that excerpt proves precisely the opposite, for the Supreme Court there explained that, at the summary judgment stage—despite the indisputable

32

matter of "common sense," *Iqbal*, 556 U.S. at 679, to answer it: Appellant's allegations are more than enough to "nudge[]" her claim "across the line from conceivable to plausible." *Twombly*, 556 U.S. at 570.

*Third*, by requiring Appellant to plead that Schroeter had actual knowledge of a bullet in the chamber, the District Court imposed a novel and heightened culpability standard on a plaintiff pleading deliberate indifference, elevating knowledge of a "substantial risk" of harm to knowledge of a certainty of harm, confusing the "conscious disregard" standard that applies where an officer can exercise "unhurried judgment" with the far higher standard of "intent to harm" that applies when an officer a state actor must act in a "hyperpressurized environment requiring a snap judgment," *Vargas*, 783 F.3d at 973–74 (brackets and internal quotation

---

inference of actual knowledge raised by obviousness of risk—there may yet be a genuine issue of material fact because "a prison official may show that the obvious escaped him." *Farmer*, 511 U.S. at 843 n.8. The Court then proceeded to observe that, at trial, obviousness of risk *alone* could support a finding of liability, stating that if "circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 842–43. In short, *Farmer* recognizes that obviousness of risk alone can be sufficient to survive summary judgment and to establish actual knowledge at trial; *a fortiori*, it is sufficient to give rise to an inference of actual knowledge at the pleading stage.

marks omitted), and, at bottom, requiring a plaintiff to plead criminal (and here, homicidal) intent to overcome qualified immunity.[17]

"Intent to harm," however, far exceeds what is required to plead deliberate indifference. *Vargas*, 783 F.3d at 973–74. In discussing deliberate indifference in the Eighth Amendment

---

[17] The District Court also suggested at one point that the complaint was deficient for failure to plead that Schroeter was "consciously aware that he had failed to follow all of the safety rules and proceeded anyway," emphasizing the lack of an allegation that Schroeter "realize[d] in the moment" he was not following the rules. *Kedra*, 161 F. Supp. 3d at 363. There is no requirement, however, that a defendant be thinking "in the moment" he causes injury that he is violating relevant safety rules. As Appellant astutely observes, to the extent the District Court acknowledged the allegation that Schroeter knew the gun safety rules and acted in violation of them, but found fault in Appellant's failure to specifically allege that Schroeter "kn[ew] he was acting in violation of them," its parsing of the culpability analysis "seems akin to counting angels dancing on the head of a pin." Appellant's Br. 18. More importantly, however, *Farmer* and our case law have not required a plaintiff to plead and prove conscious disregard of safety rules as an element of a state-created danger claim, but rather "conscious disregard of a substantial risk of serious harm," *Vargas*, 783 F.3d at 973–74 (brackets and internal quotation marks omitted); *see also Farmer*, 511 U.S. at 842—a standard that, as discussed *supra* at Section III.B.1, may be supported (as it is here) by a variety of factual allegations, including the state actor's violation of applicable safety protocols before the harm is actually inflicted.

34

context, the Supreme Court has emphasized that a claimant "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. We too have made this distinction clear in the Fourteenth Amendment context, describing "deliberate indifference" as a "willingness to ignore a foreseeable danger or risk," *Morse*, 132 F.3d at 910, and observing that conscience-shocking behavior for "unhurried" situations, *Vargas*, 783 F.3d at 973, requires "proof of something less than knowledge that the harm was practically certain . . . [to] occur," *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002).

The cases in which we have applied this standard also illustrate that the subjective knowledge test requires knowledge only of the substantial *risk* of serious harm, not of the certainty of that harm. For instance, in *Kneipp*, we held that the plaintiffs could show the defending police officers' mental state of "willful disregard" based on the foreseeable risk that serious harm was likely to befall an unescorted woman whom they had left "in a visibly intoxicated state in cold weather"; we did not require the plaintiffs to allege that the police officers knew with certainty that the woman would fall down an embankment and suffer hypothermia. 95 F.3d at 1208–09. In *Phillips*, we held that the plaintiff adequately alleged deliberate indifference because the complaint had "allege[d] facts [showing] that the defendants . . . foresaw the danger of harm their actions presented," even if the complaint did not allege that the defendants knew with certainty that their former co-worker would find and kill his ex-girlfriend, her sister, and her then-boyfriend. 515 F.3d at 228–29, 240–41.

35

And more recently in *L.R.*, we denied qualified immunity to the teacher who released a kindergartener into the custody of a stranger, observing that the teacher was "aware of the risk of harm in releasing [the child] to a stranger, even if he was unaware of [the perpetrator's] specific criminal intent." 836 F.3d at 246.

As these cases make clear, all that is required to satisfy deliberate indifference is "conscious disregard of a substantial risk of serious harm," *Vargas*, 783 F.3d at 973–74 (brackets and internal quotation marks omitted), regardless of whether that harm is either intended or certain to occur, *see Lewis*, 523 U.S. at 852 n.11; *L.R.*, 836 F.3d at 246; *Phillips*, 515 F.3d at 241; *Kneipp*, 95 F.3d at 1208–09. That is the standard applicable where, as here, an official has time to make "unhurried judgments," *Vargas*, 783 F.3d at 973, and Appellant's factual allegations are more than sufficient to satisfy that standard. *See supra* Section III.B.1. What is *not* required is knowledge of certainty of harm or the intent to harm—the standard expressly adopted by the District Court. *See Kedra*, 161 F. Supp. 3d at 363–66.

*Lastly*, the District Court's approach to deliberate indifference is inconsistent not only with the applicable pleading and culpability standards, but also with the purposes of the state-created danger doctrine. Although the District Court found that Schroeter could not be held liable for deliberate indifference without an allegation of intent to harm, *see Kedra*, 161 F. Supp. 3d at 363–66, this approach is mistaken, for requiring criminal or even homicidal intent for liability under the state-created danger doctrine disregards the twin goals of compensation and deterrence underlying the

36

doctrine and, more broadly, ignores the statutory goals that Congress codified in 42 U.S.C. § 1983.

The state-created danger doctrine—rooted in the Fourteenth Amendment's guarantee of due process, which is "designed to . . . secure certain individual rights against both State and Federal Government," *Daniels v. Williams*, 474 U.S. 327, 332 (1986)—exists to provide plaintiffs with recompense when a state official, who is entrusted with particular responsibilities and duties with respect to a particular person or "class of persons," *Bright*, 443 F.3d at 281 (discussing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989)), acts with at least "conscious disregard of a substantial risk of serious harm," *Vargas*, 783 F.3d at 973–74 (brackets and internal quotation marks omitted), and affirmatively uses his authority "in a way that create[s] a danger to [a] citizen or that render[s] the citizen more vulnerable to danger" than had he not acted at all, *Bright*, 443 F.3d at 281. Because the state-created danger doctrine applies only where these particular special relationships exist, the victims of the state officials' acts will always be persons who either expected the officials not to injure them or justifiably relied on the officials to protect them from threats to their safety. *See, e.g.*, *L.R.*, 836 F.3d at 239–40, 247; *Phillips*, 515 F.3d at 228–29, 242–43; *Kneipp*, 95 F.3d at 1201–05, 1209 (citing *DeShaney*, 489 U.S. at 199–200). Where such officials in unhurried situations consciously disregard the risk of harm to persons relying on them for safety, even if the officials did not know with certainty that their actions would lead to serious or lethal harm, the victims—or at least their survivors—are entitled to recompense.

37

What's more, remedies under § 1983, as applied to state-created danger cases, not only seek to "provide relief to victims," but also serve the additional "purpose . . . [of] deter[ring] state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *Squires v. Bonser*, 54 F.3d 168, 172 (3d Cir. 1995) (quoting *Wyatt v. Cole*, 504 U.S. 158, 161 (1992)). When officers know that they may be held liable under § 1983 for conscience-shocking behavior that endangers persons relying on them, *see Bright*, 443 F.3d at 281, the threat of § 1983 state-created danger suits acts as a deterrent force against individual officers acting with "conscious disregard of a substantial risk of serious harm," *Vargas*, 783 F.3d at 973–74 (brackets and internal quotation marks omitted). This "important public purpose" also helps "protect[] the rights of the public at large," *Livingstone v. N. Belle Vernon Borough*, 91 F.3d 515, 535 (3d Cir. 1996), because, to the extent that municipalities may be held liable for their officers' conduct, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), and to the extent non-municipal governmental entities are obliged to indemnify officers held liable under § 1983, *see generally, e.g.*, N.J. Stat. Ann. § 59:10A-1, state-created danger suits encourage these entities to implement and provide training on policies that deter such conscience-shocking conduct, *cf. Monell*, 436 U.S. at 694–95.

In sum, because the allegations in Appellant's complaint collectively give rise to the inference that Schroeter acted with actual knowledge of a substantial risk of lethal harm—that is, knowledge that gives rise to "a degree of culpability that shocks the conscience" under the then-clearly established actual knowledge theory of deliberate indifference, *Bright*, 443 F.3d at 281; *see Farmer*, 511 U.S. at 837–38, 843

n.8; *Sanford*, 456 F.3d at 309–10 & n.13—Appellant has adequately pleaded her state-created danger claim.[18]

C.     Whether the Right at Issue Was Clearly Established

Having concluded that the facts, as alleged, plead the elements of a substantive due process violation under a clearly established theory of liability, we must still contend with Schroeter's argument that there was no precedent sufficiently "*factually similar to the plaintiff's allegations*[] to put [him] on notice that his . . . conduct [was] constitutionally prohibited." Appellee's Br. 26 (quoting *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016)). This targets the second prong of the qualified immunity analysis from a different angle and requires us to ask "the objective (albeit fact-specific) question whether a reasonable officer could have believed [Schroeter's conduct] to be lawful, in light of clearly established law and the information [he] possessed." *Anderson*, 483 U.S. at 641; *see also Beers-Capitol*, 256 F.3d at 142 n.15.

---

[18] Contrary to our concurring colleague's concerns about what our holding in this case portends for state-created danger cases or the element of deliberate indifference going forward, we do not today "reduc[e] the standard of deliberate indifference" anywhere "close to negligence." Concurrence at 10. Instead, we require of Appellant's complaint what we have historically required for liability under the state-created danger doctrine: allegations of conscience-shocking, affirmative behavior from a state official that caused "foreseeable and fairly direct" harm to a person who was a foreseeable victim of that behavior. *Bright*, 443 F.3d at 281.

Because the District Court here concluded Appellant's theory of deliberate indifference was not clearly established law, it did not proceed to define the specific right at issue or to address whether that right was itself clearly established at the relevant time. *See Kedra*, 161 F. Supp. 3d at 365. However, "[d]efining the right at issue is critical to this inquiry." *L.R.*, 836 F.3d at 248. We must frame the right at issue "in light of the specific context of the case, not as a broad general proposition," *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam), and so while "[i]ndividuals indeed have a broad substantive due process right to be free from 'unjustified intrusions on personal security,'" *L.R.*, 836 F.3d at 248–49, that defines the right at issue at too high a level of generality.

Here, in view of the allegations of the complaint, we define what is at issue as an individual's right not to be subjected, defenseless, to a police officer's demonstration of the use of deadly force in a manner contrary to all applicable safety protocols.[19] We then must determine whether the

---

[19] Our concurring colleague would define the right at issue as "a police officer's right not to be subjected to a firearms training in which the instructor acts with deliberate indifference, that is, consciously disregards a known risk of death or great bodily harm." Concurrence at 12–13. But that definition is broader, not narrower, than what we articulate because it is susceptible to a wide range of applications and is not, by its terms, anchored in any factual scenario. Moreover, with that definition, it is a foregone conclusion whether the right is "clearly established," because its definition merely repeats the elements of the claim. Both to "give[] government officials breathing room to make reasonable but mistaken judgments," *Messerschmidt v. Millender*, 565 U.S. 535, 546

contours of that right are sufficiently clear that "a reasonable officer would understand that what he is doing violates that right." *Rivas*, 365 F.3d at 200. We typically look to Supreme Court precedent or a consensus in the Courts of Appeals to give an officer fair warning that his conduct would be unconstitutional. *Mammaro*, 814 F.3d at 169. However, it need not be the case that the exact conduct has previously been held unlawful so long as the "contours of the right" are

(2012), and to avoid turning the test for clearly established rights into a mere tautology, *see, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 204 (2001) (rejecting a suggestion to make "excessive force analysis indistinguishable from qualified immunity, rendering the separate immunity inquiry superfluous and inappropriate," and holding that the two "inquiries . . . remain distinct"), the Supreme Court has repeatedly admonished courts to define the right "not as a broad general proposition," *Mullenix*, 136 S. Ct. at 30, but in terms "'particularized' to the facts of the case," *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam). That definition also conflates the first and second prongs of the qualified immunity analysis, for while a plaintiff assuredly must establish the elements of a constitutional violation at the first prong, we do not require those elements to be restated within the definition of a right at the second prong to assess whether that right was clearly established. Rather, the focus of that assessment is whether the specific conduct at issue is sufficiently "factually similar" to then-existing precedent to put a reasonable officer "on notice that his . . . conduct [was] constitutionally prohibited," *Mammaro*, 814 F.3d at 169, and the right at the second prong is therefore generally defined by the factual context of the "particular conduct," *Saucier*, 533 U.S. at 201, not by the legal elements of the claim, *Mullenix*, 136 S. Ct. at 308.

sufficiently clear, *Anderson*, 483 U.S. at 640, such that a "general constitutional rule already identified in the decisional law" applies with "obvious clarity," *Hope*, 536 U.S. at 741. "If the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of the law, it is not necessary that there be binding precedent from this circuit so advising." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211 n.4 (3d Cir. 2001). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances," because the relevant question is whether the state of the law at the time of the events gave the officer "fair warning." *Hope*, 536 U.S. at 741.

We are persuaded that Schroeter had such fair warning at the time of the shooting. This was not merely an accidental discharge of a firearm that happened to be "point[ed] . . . at another officer" at the time. Concurrence at 1. Instead, at a training Kedra was required to attend, he was subjected to his training instructor contravening each and every firearm safety protocol by skipping over both required safety checks, treating the firearm as if it were unloaded, pointing the firearm directly at Kedra, and pulling the trigger.

Our case law made it clear at that time that state actors may be liable for affirmatively exposing a plaintiff to a deadly risk of harm through "highly dangerous . . . conduct," *Morse*, 132 F.3d at 910 n.10, or through "us[ing] their authority as police officers to create a dangerous situation or to make [the victim] more vulnerable to danger had they not intervened," *Kneipp*, 95 F.3d at 1209, and that officials are expected to use the benefit of their expertise and professional training when confronted with situations in which they are responsible for preventing harm to other individuals, *see Rivas*, 365 F.3d at

42

194–95.  Under that case law, no reasonable officer who was aware of the lethal risk involved in demonstrating the use of deadly force on another person and who proceeded to conduct the demonstration in a manner directly contrary to known safety protocols could think his conduct was lawful.  On the contrary, as we observed in *Beers-Capitol*, "a reasonable [state actor] could not believe that h[is] actions comported with clearly established law while also believing that there is an excessive risk to the plaintiff[] and failing to adequately respond to that risk."  256 F.3d at 142 n.15.

In addition to our own case law and that of the Supreme Court, "we routinely consider decisions by other Courts of Appeals as part of our 'clearly established' analysis when we have not yet addressed the specific right asserted by the plaintiff."  *Williams v. Bitner*, 455 F.3d 186, 192–93 (3d Cir. 2006) (collecting cases).  A closely analogous case from the First Circuit confirms that a reasonable officer would anticipate liability for this conduct.  In *Marrero-Rodríguez v. Municipality of San Juan*, that court considered the actions of a police lieutenant who violated numerous safety protocols while engaging in a training session.  677 F.3d 497, 500 (1st Cir. 2012).  In participating in the live demonstration exercise there, the officer failed to discharge the bullets from his gun into a sandbox as required when entering the training area, used a real gun rather than the required "dummy" gun, and shot the gun directly into the back of a trainee—who was not wearing a bulletproof vest—while the trainee was lying face-down on the ground.  *Id.*  Just as here, there was no allegation that the officer knew his gun was loaded or that he intended to harm his fellow officer. The court nonetheless concluded that "using what was obviously lethal force, entirely disproportionate to any reasonable need, in conducting the lesson" was

43

"shockingly indifferent to the rights" of the trainee.[20]  *Id.* at 501–02; *cf. Hawkins v. Holloway*, 316 F.3d 777, 787 (8th Cir. 2003) (holding that "an official's threat to employ deadly force" with a firearm rose to the level of "arbitrary and conscience shocking behavior prohibited by substantive due process"); *Grandstaff v. City of Borger*, 767 F.2d 161, 167–68 (5th Cir. 1985) (holding it was clearly established that the use of "deadly force, in *conscious disregard* of substantial risk of harm to innocent parties" was a constitutional due process violation).[21]

---

[20] The Concurrence seeks to distinguish *Marrero-Rodríguez* from this case on the ground that there "dummy guns" were to be used, 677 F.3d at 500, whereas here the training involved real firearms.  For purposes of deliberate indifference, however, this is a distinction without a difference.  In both cases, the officer used a firearm in a way that was not allowed by failing to conduct basic safety checks to determine whether the firearm was loaded prior to firing it.  That Schroeter made a "mistake, however reckless," Concurrence at 16, is exactly the point: "[R]eckless[] disregard[]" of a "substantial risk of serious harm" is the very definition of deliberate indifference.  *Farmer*, 511 U.S. at 836.

[21] As Appellant points out, Fourth Amendment excessive force cases like *Baird v. Renbarger*, 576 F.3d 340 (7th Cir. 2009), and *Couden v. Duffy*, 446 F.3d 483 (3d Cir. 2006), which recognize a citizen's clearly established right not to have a police officer "point" a gun at him if he poses "no hint of danger," *Baird*, 576 F.3d at 346–47; *accord Couden*, 446 F.3d at 497–98, also support the notion that the substantive due process right here was clearly established.  While we need not rely on those cases given the ample case law supporting the clearly established nature of this right in the substantive due

Schroeter, however, relies on *Spady v. Bethlehem Area School District* to argue that the right here should be defined more narrowly and that this right was not clearly established at the time. 800 F.3d 633 (3d Cir. 2015). In *Spady*, a student was briefly submerged in water during a swimming class, exited the pool and complained of some chest pain, returned to the pool as directed for the remainder of the class, and more than an hour later suffered serious distress and death from a rare condition known as "dry drowning." *Id.* at 635–36. In the face of this extremely unusual and "non-apparent condition," we defined the right there as "the right to affirmative intervention by the state actor to minimize the risk of secondary or dry drowning," and held that risk would not have been apparent to a reasonable gym teacher under our state-created danger cases. *Id.* at 638–42. Drawing on that analysis, Schroeter contends that the harm that came to Kedra was also due to a "non-apparent" condition, *id.* at 639, such that the right should be defined as a "right . . . in favor of a trainee in a state office which . . . requires affirmative compliance with all required safety procedures so as to . . . 'minimize the risk' to the trainees during a training session." Oral Arg. at 25:45–27:38 (quoting *Spady*, 800 F.3d at 638).

This argument mischaracterizes the risk of harm presented on the face of Appellant's complaint and misstates our case law. There is nothing "non-apparent," *Spady*, 800 F.3d at 639, in the risk of harm caused by pointing a firearm at an unarmed person and pulling the trigger at close range. Quite the opposite: The substantial risk of lethal harm is glaringly

process context itself, those Fourth Amendment cases only reinforce our conclusion here.

obvious here and bears no resemblance to the obscure and improbable risk of dry drowning, which we concluded the coach in *Spady* could not have been reasonably expected to know about or protect against. Indeed, we expressly distinguished the facts of *Spady* from those of *Kneipp*, pointing out that in *Kneipp*, the officers' "act of separating a visibly intoxicated person from her traveling companion and then forcing her to walk home alone . . . necessarily increased the obvious risk that she would fall and injure herself." *Spady*, 800 F.3d at 639. And at issue here is not a training instructor's failure to "compl[y] with all required safety procedures" to minimize the risk to trainees, Oral Arg. at 26:00–26:06; it is a training instructor's physical demonstration of the use of deadly force on a defenseless subject while failing to comply with *any* required safety procedure to avoid the risk of death. *Spady* is simply inapposite where, as here, the risk was obvious, the risk was actually known to the state actor, the safety precautions that could have avoided that risk were the very subject matter of the actor's training and expertise, and those safety precautions were skipped or directly contravened.

In sum, the right alleged to have been violated was clearly established, and Appellant's complaint sufficiently pleads a violation of that right. Accordingly, Schroeter was not entitled to qualified immunity.

## IV. Conclusion

For the foregoing reasons, we will reverse and remand for proceedings consistent with this opinion.

46

JOAN KEDRA, in her own right and as personal representative of the estate of David Kedra, Appellant v. RICHARD SCHROETER

No. 16-1417

FISHER, *Circuit Judge*, concurring.

It is undeniable that this tragic death never should have occurred and it is indisputable that defendant Schroeter should have known better than to point a gun at another officer without following proper safety precautions. So at first glance, it is difficult to find fault with the majority's compelling discussion of why Schroeter's conduct shocks the conscience. Nonetheless, I file this concurrence to explain my belief that the District Court's judgment should be reversed on narrower grounds than those on which the majority relies.

I.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). It involves a two-step process, which a court may address in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The first step "asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (per curiam) (internal quotation marks and alterations omitted). The second step "asks whether the right in question was clearly established at the time of the violation." *Id.* at 1866 (internal quotation marks omitted).

1

The District Court granted Schroeter qualified immunity under the second prong, concluding that it was not clearly established that he could violate a constitutional right without actual knowledge that his actions posed a substantial risk of harm. The majority reverses, concluding that (1) Kedra has pleaded that Schroeter acted with actual knowledge that his actions posed a substantial risk of harm, and (2) the right at issue here was clearly established.

The Supreme Court recently noted that it "has issued a number of opinions reversing federal courts in qualified immunity cases" over "the last five years." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam). It has expressed "reluctan[ce] to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Mindful of these cautionary words, I would limit this decision to the narrowest possible grounds, and would reverse solely because of the allegation that Schroeter pleaded guilty to recklessly endangering another person in Pennsylvania court. I do not believe that the other allegations on which the majority relies are sufficient—separately or together—to state a claim.

A.

To prove a constitutional violation under the state created danger theory, a plaintiff must establish four elements: that "(1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts …; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that

2

rendered the citizen more vulnerable to danger than had the state not acted at all." *Sanford v. Stiles*, 456 F.3d 298, 304-05 (3d Cir. 2006) (per curiam). In the District Court, the parties agreed that the element at issue is the second one: whether Kedra alleged that Schroeter's conduct shocks the conscience.[1]

The Supreme Court has explained that "negligently inflicted harm is categorically beneath the threshold of constitutional due process," while "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). "Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." *Id.* (internal quotation marks and citation omitted). This is precisely such a close-call case—which is why we should, as the Supreme Court has advised, be reluctant to expand the concept of substantive due process. *Collins*, 503 U.S. at 125.

---

[1] The majority notes that on appeal, Schroeter appears to contest the fourth element by arguing that his conduct constituted a failure to act, rather than an "affirmative act," as is required. *Sanford v. Stiles*, 456 F.3d 298, 305 (3d Cir. 2006). The complaint sufficiently alleges that, by not performing safety checks and then raising and firing the gun, Schroeter "created an opportunity for harm that would not have otherwise existed." *Rivas v. City of Passaic*, 365 F.3d 181, 197 (3d Cir. 2004) (combination of acts and omissions satisfied fourth prong of state created danger analysis).

3

I agree with the majority that here, there was no "hyperpressurized environment" and "unhurried judgments" were possible. Therefore, the level of culpability required to shock the conscience is deliberate indifference. *Sanford*, 456 F.3d at 309. We have defined deliberate indifference as falling in the "middle range" identified by the Supreme Court—"between intent, which includes proceeding with knowledge that the harm is substantially certain to occur and negligence, which involves the mere unreasonable risk of harm to another." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 n.10 (3d Cir. 1997) (internal quotation marks omitted). Since we first adopted the state created danger theory, we have repeatedly left open whether the appropriate standard for evaluating deliberate indifference in a substantive due process case is subjective or objective. *See, e.g.*, *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 428 n.5 (3d Cir. 2006); *Sanford*, 456 F.3d at 309 n.13. In many cases, a subjective standard will be more demanding, requiring the plaintiff to allege specific facts that shed light on the defendant's mental state, rather than more general notions of what should have been objectively clear.

The majority acknowledges that the subjective standard applies here, because it was the standard established in our case law at the time of Trooper Kedra's death. Nevertheless, the majority goes on to analyze case law post-dating the conduct at issue: *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), and *L.R. v. School District of Philadelphia*, 836 F.3d 235, 246 (3d Cir. 2016), among others. Maj. Op. at 17-19. This discussion is unnecessary to the resolution of the case, and I would therefore avoid it. Because the majority has spoken, though, I feel compelled to note my disagreement.

The majority definitively states that we settled the question of whether a subjective or objective standard applies

4

when we observed that the risk of harm from the teacher's alleged conduct was "'so obvious' as to rise to the level of deliberate indifference." *L.R.* 836 F.3d at 246. In *L.R.*, however, we did not explicitly acknowledge the existence of two possible standards—subjective versus objective—or discuss the differences between them. *See id.* We did not indicate that we were adopting the objective standard or provide any reason for doing so, which would be a surprising way of ruling definitively on an issue that has split our sister Circuits. Moreover, the *L.R.* plaintiff made allegations that would be sufficient under the subjective standard: the teacher asked the stranger for identification, illustrating that he was "indeed aware of the risk of harm" in releasing the child to a stranger. *Id.* Therefore, *L.R.*'s less-than-clear allusion to the objective standard was dicta that was unnecessary to our resolution of the appeal.

The majority's other cases are no more persuasive. In *Kingsley*, the Supreme Court held that an objective standard applied to a § 1983 claim alleging a violation of Fourteenth Amendment substantive due process rights. 135 S. Ct. at 2472. But *Kingsley* involved an excessive force claim by a pretrial detainee. 135 S. Ct. at 2470. Although *Kingsley* and this case both involve Fourteenth Amendment claims, I do not see that prisoner cases, which implicate a host of specialized policy concerns, have much bearing on state created danger cases. The Supreme Court's reasons for adopting the objective standard included prior case law analyzing pretrial detainee excessive force claims; the objective standard's congruence with prison guards' training; and the fact that the objective standard incorporates "deference to policies and practices needed to maintain order and institutional security." *Id.* at 2473-75. None of those reasons apply here. Pretrial detainee cases from our sister

5

Circuits are similarly unpersuasive. *See Darnell v. Pineiro*, 849 F.3d 17, 33 (2d Cir. 2017); *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016). Prisoner claims under the Eighth Amendment are even further afield. *See Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017).

The subjective standard is the appropriate test for deliberate indifference in a substantive due process case because the Fourteenth Amendment is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States." *Daniels v. Williams*, 474 U.S. 327, 332 (1986) (internal quotation marks omitted). The subjective standard better aligns with the purposes and limits of § 1983. *Kaucher*, 455 F.3d at 428 n.5 (an "objective standard" would "move the concept of deliberate indifference … closer to the pole of negligence").

Regardless of my disagreement with the majority's reading of cases it acknowledges are unnecessary to its decision here, I agree with the majority that the qualified immunity determination turns on whether Kedra has pleaded facts from which we can infer that Schroeter acted with actual knowledge or "a 'conscious disregard of a substantial risk of serious harm.'" *L.R.*, 836 F.3d at 246 (quoting *Vargas v. City of Phila.*, 783 F.3d 962, 973–74 (3d Cir. 2015)). And while I appreciate that the lines between intentional conduct, negligence, gross negligence, recklessness, and conscious disregard may be difficult to pinpoint, in a case like this they are critical. Because negligence is not enough to shock the conscience but instead denotes "culpable carelessness," *Negligence*, Black's Law Dictionary (10th ed. 2014), Kedra must allege that Schroeter acted with more than culpable carelessness to have violated the Constitution.

Kedra satisfies this burden due to her allegation that Schroeter pleaded guilty in Pennsylvania court to reckless endangerment of another person. As the majority notes, by doing so, Schroeter agreed that he "recklessly engage[d] in conduct which place[d] … another person in danger of death or serious bodily injury." 18 Pa. Cons. Stat. § 2705. Under Pennsylvania law, "[t]he mens rea for recklessly endangering another person is a conscious disregard of a known risk of death or great bodily harm to another person." *Commonwealth v. Hopkins*, 747 A.2d 910, 916 (Pa. Super. Ct. 2000) (internal quotation marks omitted); *see also Commonwealth v. Rich*, 167 A.3d 157, 162 (Pa. Super. Ct. 2017) (statutory definition provides that "[a] person acts recklessly … when he consciously disregards a substantial and unjustifiable risk ….") (quoting 18 Pa. Cons. Stat. § 302(b)(3)).

That language closely tracks with what is required for conscience-shocking behavior: "a 'conscious disregard of a substantial risk of serious harm.'" *L.R.*, 836 F.3d at 246 (quoting *Vargas*, 783 F.3d at 973-74). Therefore, I agree with the majority that Kedra's allegation that Schroeter pleaded guilty to reckless endangerment sufficiently alleges that he acted in a way that shocks the conscience. I also agree that the District Court missed the mark when it concluded that the guilty plea allegation is relevant "only if non-mutual offensive collateral estoppel is extended here." *Kedra v. Schroeter*, 161 F. Supp. 3d 359, 362 n.5 (E.D. Pa. 2016). This case is at the pleading stage, so all that is required is that the guilty plea "nudge[]" Kedra's allegation that Schroeter's behavior shocks the conscience "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Because the guilty plea does just that, the complaint adequately alleges what is needed for the first

7

prong of the qualified immunity analysis—namely, that Schroeter's "conduct violated a federal right," *Tolan*, 134 S. Ct. at 1865, and "shocks the conscience," *Sanford*, 456 F.3d at 304. In contrast to the majority's treatment of the guilty plea as one more allegation that saves the complaint, I believe this is where our analysis should end.

## B.

Aside from the guilty plea, the majority also relies on what it calls circumstantial evidence of conscience-shocking behavior: (1) the obviousness of the risk of pointing a gun at another person, (2) Schroeter's professional training, and (3) Schroeter's violation of safety protocols. I diverge from the majority in my belief that none of those factors adequately allege conduct that shocks the conscience.

The "obviousness of a risk is not conclusive" as to a defendant's subjective awareness of that risk. *Farmer v.*

*Brennan*, 511 U.S. 825, 843 n.8 (1994).[2] So while we "may infer the existence of this subjective state of mind from the fact that the risk is obvious," *Hope v. Pelzer*, 536 U.S. 730, 738 (2002), the obviousness of a risk could also, in an appropriate case, support an inference that there was not deliberate indifference. If Schroeter knew he failed to follow the safety procedures, he would have had to know that his gun might be loaded when he pointed it at Kedra. In other words, in order for the obviousness of the risk to support an inference of deliberate indifference, we would have to infer that Schroeter deliberately chose not to do what was necessary to determine whether the gun was loaded. That may be "possibl[e]" or "conceivable" (for instance, if Schroeter had a mental illness). But in the absence of the guilty plea—through which Schroeter admitted conscious disregard of a known risk—I would not find it "plausible," as the pleading standard requires. *Iqbal*, 550 U.S. at 679-80.

---

[2] The majority offers an interpretation under which *Farmer*, as applied at the pleading stage, means the opposite of what it says—namely, that the obviousness of a risk is, in fact, conclusive. Maj. Op. at 32-33 n.16. However, that interpretation is built on the premise that *Farmer* holds that the obviousness of risk alone could support liability. *Id.* That is incorrect. *Farmer* posits that liability could be premised on what might be called obviousness-plus: evidence that a "substantial" risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." 511 U.S. at 842 (internal quotation marks and citation omitted). Therefore, *Farmer* does not say or signify that obviousness of a risk alone is sufficient to survive a motion to dismiss. In any event, my analysis of *Farmer* is simpler than the majority's; I take it to mean what it says.

Likewise, I do not believe that Schroeter's professional training and violation of safety protocols would adequately allege conscience-shocking behavior in the absence of the guilty plea. To begin with, those allegations have a temporal problem: under a subjective standard, the relevant inquiry is Schroeter's state of mind at the time he acted. The fact that he received training beforehand does not mean he remembered it, let alone that he was aware in the moment that he failed to follow it. Second, a failure to follow police protocol is not itself sufficient to establish a constitutional violation. *Lewis*, 523 U.S. 855 ("Regardless whether [the officer's] behavior offended the … balance struck in law enforcement's own codes of sound practice, it does not shock the conscience …."); *City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) ("Even if an officer acts contrary to her training … that does not itself negate qualified immunity where it would otherwise be warranted.").

Most importantly, the majority's ruling could be read, in the future, to significantly expand the circumstances in which a plaintiff can defeat a claim of qualified immunity. Every public official receives employment-related rules and trainings, but acknowledging those rules does not itself indicate conscious awareness of the risk of harm on a future occasion. Nor does violating an established rule transform negligence into conscience-shocking behavior. However, in seeming to accord equal weight to Schroeter's prior training and his guilty plea, I fear the majority continues a trend of reducing the standard of deliberate indifference too close to negligence while also transforming qualified immunity "from a guarantee of immunity into a rule of pleading." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). And in transforming qualified immunity into a rule of pleading, our approach risks "destroy[ing] the balance that our cases strike between the

10

interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Id.* (internal quotation marks omitted).

In short, after scrutinizing the entire complaint, I conclude that aside from Schroeter's guilty plea to reckless endangerment, the remaining allegations in Kedra's complaint make out only a strong case of negligence. I do not believe they would be sufficient, by themselves, to state a claim that Schroeter acted with the deliberate indifference required to shock the conscience.

## C.

To summarize, Kedra adequately pleaded deliberate indifference, and therefore she alleged all four required elements of a state created danger claim. *Sanford*, 456 F.3d at 304-05. Having adequately pleaded her constitutional claim, Kedra has met the first requirement of the qualified immunity analysis: conduct by an officer that violates a federal right. *Tolan*, 134 S. Ct. at 1865 (2014). I arrive, then, at the second element that must be shown in order to defeat Schroeter's claim of qualified immunity: that "the right in question was clearly established at the time of the violation." *Id.* at 1866. I agree with the majority's conclusion that the right at issue in this case was clearly established—but again, based on different reasoning.

To be clearly established under qualified immunity's second prong, "a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 132 U.S. at 2093 (internal quotation marks and alterations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law

11

the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (internal citation omitted). "[A] case directly on point" is not required, "but existing precedent must have placed the … constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Hope*, 536 U.S. at 741 ("we [have] expressly rejected a requirement that previous cases be fundamentally similar" or "materially similar") (internal quotation marks and citation omitted). The touchstone is reasonableness: "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 536 U.S. at 743 (internal quotation marks omitted).

As the Supreme Court has explained, "the operation of this standard"—that is, whether a right is clearly established—"depends substantially upon the level of generality at which the relevant legal rule is to be identified." *Anderson*, 483 U.S. at 639 (internal quotation marks omitted). Therefore, the Court has repeatedly instructed us "not to define clearly established law at a high level of generality," that "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established," and that our inquiry into the clearly established prong "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted).

The majority defines the right at issue here as "an individual's right not to be subjected, defenseless, to a police officer's demonstration of the use of deadly force in a manner contrary to all applicable safety protocols." Maj. Op. at 40. I would define the right more narrowly, and in accordance with my analysis of the first qualified immunity prong in Section

12

I.A., as: a police officer's right not to be subjected to a firearms training in which the instructor acts with deliberate indifference, that is, consciously disregards a known risk of death or great bodily harm. Schroeter's admitted deliberate indifference is crucial, in my opinion, to the conclusion at the first step of the analysis that a right was violated. *See supra* Section I.A., B. Therefore, in order to narrowly define the right in light of the particular conduct at issue, *Mullenix*, 136 S. Ct. at 308, I would include deliberate indifference in the definition.

The majority disagrees with this definition of the right, saying that it conflates the first and second elements of the qualified immunity analysis. Maj. Op. at 40-41 n.19. I am not the first, however, to include a state of mind in the definition of a right. *See Grandstaff v. City of Borger*, 767 F.2d 161, 167-68 (5th Cir. 1985) (holding it was clearly established that the use of "deadly force, in *conscious disregard* of substantial risk of harm to innocent parties," was a constitutional due process violation). Nor is it troublesome, as a general proposition, that one element of a legal test overlaps with another element of the same or a related test. Indeed, the first requirement for defeating qualified immunity is redundant with the four prongs of a state created danger claim, and there is no shortage of other examples.[3]

---

[3] *See, e.g.*, *Kosilek v. Spencer*, 774 F.3d 63, 83 (1st Cir. 2014) ("[W]e have recognized that the subjective deliberate indifference inquiry may overlap with the objective serious medical need determination …."); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982) ("The commonality and typicality requirements of [Federal Rule of Civil Procedure] 23(a) tend to merge," and both "also tend to merge with the adequacy-of-representation requirement ….").

13

Given the unique facts of this case—namely, Schroeter's guilty plea—I believe it is appropriate to tether the right in question to the standard of care he admitted he breached. The majority's approach, by contrast, suffers from its focus on the violation of "all applicable safety protocols," which will inevitably lead to disputes over how many safety protocols need to be violated for qualified immunity to be forfeited. And those disputes, I predict, will devolve into a negligence-type analysis, which precedent clearly forbids. The majority's definition of the right could prove fertile ground for future plaintiffs seeking to lower the bar yet further in § 1983 cases.

Turning to whether the right as I define it was clearly established, I conclude that in light of existing case law, a reasonable person could not have believed that it was consistent with Kedra's substantive due process rights to subject him to a firearms training at which the instructor was deliberately indifferent to his safety. Therefore, the right was clearly established.

Unlike the majority, I do not read existing cases as being "fundamentally" or "materially" similar to this one. *See Hope*, 536 U.S. at 741. The lack of on-point precedent gives me pause, because a case's "present[ation] [of] a unique set of facts and circumstances" can be "an important indication" that the conduct at issue "did not violate a clearly established right." *White*, 137 S. Ct. at 552 (internal quotation marks omitted). Nonetheless, I feel constrained to conclude that Supreme Court and Circuit precedents have "clearly established" the "violative nature," *Mullenix*, 136 S. Ct. at 308, of conducting a firearms training with deliberate indifference to a known risk.

14

To begin with, the deliberate indifference standard was clearly enunciated in the state created danger context more than a decade ago and was clear at the time of Kedra's death in 2014. *Sanford*, 456 F.3d at 309 (ruling that "where deliberation is possible and officials have the time to make unhurried judgments, deliberate indifference is sufficient" to shock the conscience); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 241 (3d Cir. 2008). While our state created danger cases are not factually similar to this one—they do not involve police officers conducting firearms training—I cannot see how any reasonable official could believe that acting with deliberate indifference in the police firearms training context would be consistent with trainees' constitutional rights. A reasonable officer could not be heard to say that although he knew that 911 employees cannot release information from their database in a deliberately indifferent manner, *id.* at 243, he nevertheless thought it would comport with trainees' substantive due process rights to conduct a firearms training with deliberate indifference.

We have reasoned, in the past, that deliberate indifference is simply inconsistent with objectively reasonable conduct. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) (reasonable defendant "could not believe that her actions comported with clearly established law while also believing that there is an excessive risk to the plaintiffs and failing to adequately respond to that risk[;] [c]onduct that is deliberately indifferent to an excessive risk … cannot be objectively reasonable conduct"); *Carter v. City of Phila.*, 181 F.3d 339, 356 (3d Cir. 1999) ("If Carter succeeds in establishing that the … defendants acted with deliberate indifference to constitutional rights—as Carter must in order to recover under section 1983—then *a fortiori* their conduct was not objectively reasonable.").

15

The majority emphasizes the importance of *Marrero-Rodriguez v. San Juan*, 677 F.3d 497 (1st Cir. 2012), to its conclusion that the right at issue here was clearly established. Maj. Op. at 43-44. *Marrero-Rodriguez* involves a police trainer's deliberate indifference toward a trainee, 677 F.3d at 502, but the case has important distinctions as well. There, "dummy guns" were supposed to be used, *id.* at 500, while here, Schroeter needed to use an actual gun in order to train the other officers on its features. Also in *Marrero-Rodriguez*, what the instructor was supposedly "training" the other officers to do would have itself amounted to a gross violation of the rights of criminal suspects. *Id.* at 502. There are no such allegations here.

The majority dismisses the materially differing facts in *Marrero-Rodriguez* as a distinction without a difference. But the fact that the instructor there brought a real gun to a training meant to involve dummy weapons injected a level of danger into the training that never would have existed absent that deliberate act. Here, the training required a live weapon, so the inherent risk was of a different order than the risk involved in the *Marrero-Rodriguez* training. Kedra does not allege that Schroeter's conduct was anything other than a mistake, however reckless. The same cannot be said for the instructor in *Marrero-Rodriguez*, and that should make a difference.

Regardless, as I explain above, the Supreme Court's and our court's precedents clearly establish the right in question, even in the absence of directly on-point precedent. It is therefore immaterial whether *Marrero-Rodriguez* may have also put Schroeter on notice that his conduct was violative of that right.

16

II.

I am concerned by the impact that the breadth of the majority's decision could have on the law of qualified immunity. I am equally troubled by the recent trajectory of this Court's jurisprudence. In my mind, we have gradually expanded substantive due process protections to cases where they should not apply by tortifying the Constitution and chipping away at the standards necessary to show deliberate indifference.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall … deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1, cl. 2. Shortly after the Fourteenth Amendment's adoption, the Supreme Court analyzed the meaning of the Due Process Clause and stated that the Clause was "intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice." *Hurtado v. California*, 110 U.S. 516, 527 (1884) (quoting *Bank of Columbia v. Okley*, 17 U.S. (4 Wheat.) 235, 244 (1819)). Since then, the Supreme Court has explained that "the Due Process Clause of the Fourteenth Amendment was intended to prevent the government from abusing its power," *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (internal quotation marks and alterations omitted), but not to "transform every tort committed by a state actor into a constitutional violation." *Id.* at 202; *see also Lewis*, 523 U.S. at 845 ("We have emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government ….") (internal quotation marks omitted). The Supreme Court has accordingly "emphasized that only the most egregious official conduct can be said to be arbitrary in

17

the constitutional sense." *Id.* at 846 (internal quotation marks omitted).

In assessing what behavior is egregious enough to state a claim under the Due Process Clause, the Supreme Court has "spoken of the cognizable level of executive abuse of power as that which shocks the conscience" or "violates the 'decencies of civilized conduct.'" *Id*. In so doing, it has recognized that the Due Process Clause is "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety." *DeShaney*, 489 U.S. at 195. But it has also recognized some limited exception to that rule. In *DeShaney*, the Supreme Court noted that "when the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id*. at 199-200. *DeShaney* also left open the question of whether a constitutional violation could occur absent a custodial relationship when it stated: "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it render him any more vulnerable to them." *Id*. at 201.

Relying on that dicta in *DeShaney*, several Circuits recognized a state created danger theory for establishing a constitutional claim under § 1983, and we joined them in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996). The Supreme Court has yet to explicitly adopt the now widely-recognized state created danger theory, and the Circuits have yet to enforce a uniform approach to its application. But consistent with the fact that the Due Process Clause was not meant to constitutionalize state tort law, our state created danger theory encompasses four elements that provide some insurance that it protects the individual only from those abuses of power that lie at the heart of the concept of due process. Since "liability

18

for negligently inflicted harm is categorically beneath the threshold of constitutional due process," *Lewis*, 523 U.S. at 849, the requirement that the government official act with a degree of culpability that shocks the conscience is perhaps the most critical element to providing that insurance. And recognizing the importance of the culpability requirement, our cases have frequently sought to evaluate the degree of culpability required to prevail under our state created danger theory.

Unfortunately, because the rules of substantive due process are not "subject to mechanical application in unfamiliar territory," *id.* at 850, we have, like the Supreme Court, struggled with how to define culpability falling between the intentional conduct that can sustain a due process violation and the negligent conduct that cannot. In this regard, the Supreme Court has offered that recklessness or gross negligence may be actionable in some cases, but the only case the *Lewis* court cited as establishing liability in that middle range, *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239 (1983), involved a pre-trial detainee who was in government custody and therefore restrained from acting on his own behalf. Because "when the State takes a person into custody" it renders him unable to exercise ordinary responsibility for his own welfare, such cases implicate a unique context where "the Constitution imposes upon [the State] a … duty to assume some responsibility for [that person's] safety and general well-being." *Deshaney*, 489 U.S. at 199-200. And consequently, Justices Scalia and Thomas have asserted that the Supreme Court has "expressly left open whether, in a context in which the individual has *not* been deprived of the ability to care for himself in the relevant respect, something less than intentional conduct, such as recklessness or gross negligence, can ever constitute a

deprivation under the Due Process Clause." *Lewis*, 523 U.S. at 863 (Scalia, J., concurring in the judgment) (internal quotation marks omitted).

Despite the fact that the Supreme Court left this question open, we have recognized such liability by defining deliberate indifference as "appear[ing] to fall somewhere between intent, which includes proceeding with knowledge that the harm is substantially certain to occur and negligence, which involves the mere unreasonable risk of harm to another." *Morse*, 132 F.3d at 910 n.10 (internal quotation marks omitted). I question the validity of this definition. Gross negligence and recklessness are cognizable under state tort law, and the Supreme Court has "rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law." *Collins*, 503 U.S at 128; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2479 (2015) (Scalia, J., dissenting).

In my view, it is troubling how far we have expanded substantive due process, a concept the Supreme Court has been reluctant to expand. *Collins*, 503 U.S. at 125. Originally, the Due Process Clause prevented only those government actions that violate "those canons of decency and fairness which express the notions of justice of English-speaking peoples." *Rochin v. California*, 342 U.S. 165, 169 (1952) (internal quotation marks omitted). We took a second step by fashioning a state created danger theory. *Kneipp*, 95 F.3d at 1211. We then took a third step, stating that there could be liability in non-custodial situations for gross negligence. *See, e.g.*, *Sanford*, 456 F.3d at 310. The Supreme Court, however, is still at step one. Given that our substantive due process doctrine has gradually lowered the bar for bringing a state

created danger claim, it may be time for this full Court to reexamine the doctrine.

## III.

Perhaps the full Court will revisit the qualified immunity framework to reexamine whether it is consistent with the history of the Due Process Clause. Perhaps the Supreme Court will clarify the governing law by weighing in on the state created danger theory before we expand this substantive due process doctrine even further. In the meantime, it is worth remembering:

> The people … may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations such as the present one. They may create such a system, if they do not have it already, by changing the tort law of the State in accordance with the regular lawmaking process. But they should not have it thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment.

*DeShaney*, 489 U.S. at 203. I offer this concurrence in the hope that it might steer us toward a firmer commitment to this principle.